"Stopping is opposed to the idea of negligence, and unless, notwithstanding the stop, the whole evidence shows negligence so clearly that no other inference can be drawn from it, the court cannot draw the inference as a conclusion of law, but must send the case to the jury."

As the plaintiff advanced from the usual stopping place, he had a view for 1,400 feet before his horses reached the first track, and no train was in sight. He saw all that he could have seen if he had gone forward before starting to cross. Neither the court nor the jury could properly adjudge him negligent in attempting to cross.

When he first saw the train, his horses were near the middle of the crossing and he had reason to believe that it was safer to go on than to stop on the first or second tracks where trains passed every few minutes, or to attempt to back off. He was, moreover, confronted by a sudden peril and could not be held to the exercise of the highest degree of prudence.

The judgment is affirmed.

---

# Maggini, Appellant, v. Jones.

*Trusts and trustees—Laches—Evidence—Equity.*

On a bill in equity to enforce a trust it was alleged that the defendant's testator twenty-eight years before the filing of the bill bought in property of a married woman, mother of the plaintiffs, under an agreement by which he was to pay plaintiff's father $3,000 per year, and after his death $50,000 to his family. Over a year after the sale, the plaintiff's father and mother executed for a consideration of about $2,500, a quitclaim deed to the defendant's testator for the property in question. Plaintiff's father during his lifetime never made any demand as of right against the testator of defendants, although he did appeal to his generosity for help. The bill was not filed until over two years after testator's death. *Held*, that the bill involved a stale claim, and was properly dismissed.

Argued Oct. 30, 1908. Appeal, No. 218, Oct. T., 1908, by plaintiffs, from decree of C. P. No. 3, Allegheny Co. Feb. T., 1906, No. 736, dismissing bill in equity in case of Robert S.

Maggini, trustee of the estate of John H. McMasters et al., v. Benjamin F. Jones et al., executors and trustees of the last will and testament of Benjamin F. Jones, Jr., deceased, et al. Before FELL, BROWN, MESTREZAT, POTTER, ELKIN and STEWART, JJ. Affirmed.

Bill in equity to declare a trust.

EVANS, J., filed the following opinion:

The plaintiff files this bill, alleging that at the time of the death of Benjamin F. Jones he was the trustee of a certain fund, amounting to about $50,000, for the benefit of John H. McMasters and his children, and that that trust fund came into the hands of the defendant, and prays that the court declare the trust and compel the defendants to account.

### FINDINGS OF FACT.

1. Prior to January 5, 1876, John H. McMasters was the owner of a certain lot of land situate in the city of Pittsburg, fronting on Liberty street and known as the Seventh Avenue Hotel property. On that date he, with his wife, Frances McMasters, executed a deed to David M. McMasters, the consideration being $1.00, who, for the same consideration, on January 25, 1876, executed a deed to Frances McMasters, the wife of John H. McMasters. This conveyance, being a voluntary conveyance, passed no title as affecting the creditors of John H. McMasters.

2. In May of 1877, John H. McMasters was largely indebted; a petition to have him declared a bankrupt had been presented to the district court of the United States; there were several mortgages against this Seventh Avenue Hotel property, and among others a mortgage to Moses and A. C. Silverman.

3. Benjamin F. Jones was the uncle, by marriage, of John H. McMasters, and in May, 1877, he met John H. McMasters at the place of business of the Silvermans, and there were present on that occasion John H. McMasters, Moses and A. C. Silverman, John M. Osborne, Dr. D. M. McMasters and Benjamin F. Jones. At this interview B. F. Jones proposed to McMasters that if the bankruptcy proceedings were dismissed and the Seventh

Avenue Hotel property brought to sheriff's sale he would buy it at sheriff's sale and hold the difference between the amount that the property cost him and $125,000 in trust for McMasters and his family, paying to McMasters the income at six per cent during his life and after his death to his family.

4. Following this, the bankruptcy proceedings were dismissed, the mortgage of the Silvermans foreclosed and assigned to Benjamin F. Jones, the property offered at sheriff's sale and bid in by Jones, he taking a deed from the sheriff, acknowledged October 13, 1877.

5. The total cost of the property to Jones up to and including the costs at the sheriff's sale was a little over $75,000.

6. A short time after the sheriff's sale B. F. Jones and David M. McMasters, brother of John H. McMasters, met in the Seventh Avenue Hotel, and B. F. Jones made to David M. McMasters the following statement:

"You know that I had an agreement with John to do certain things, to put aside certain money for him and his family; now, since that I have had Dr. Hostetter and Mr. Anderson go over this property and Dr. Hostetter tells me he would not take it for the mortgage that is on it; he said, 'Under all the circumstances I do not think that I ought to be held up to the agreement that I made with John.'"

7. This conversation was reported by Dr. McMasters to John H. McMasters. On several occasions within the next ten years B. F. Jones denied any obligation on his part to McMasters or his family, and these acts of Jones repudiating any liability were reported to McMasters.

8. John H. McMasters and Frances H. McMasters, his wife, by a quitclaim deed dated November 7, 1877, and acknowledged December 4, of the same year, in consideration of $2,458.36, quitclaimed and released to B. F. Jones their interest in the property which we have designated as the Seventh Avenue Hotel property.

9. Benjamin F. Jones died testate on May 19, 1902.

### CONCLUSIONS OF LAW.

1. This is a stale claim. This bill was filed twenty-eight and

one-half years after the alleged trust was created, and during that time, when, if the trust was in existence, B. F. Jones should have paid to McMasters something in the neighborhood of $3,000 a year. While McMasters was in serious pecuniary difficulties all that time he never demanded the fulfillment of these trust obligations on the part of Jones, and in the face of the repudiation on the part of Jones on many occasions of any existence of such a trust no steps were taken to have the court declare a trust and enforce its provisions until something over two years after Jones' death. This of itself would cause the court to hesitate and require clear and convincing proof that the trust was in existence at the time of the death of B. F. Jones.

2. In 1877, at the time that Jones proposed to buy this property, and hold the difference between what he should pay for it and $125,000 in trust for McMasters and his family, McMasters was not the owner of the hotel property, but as against him and as against all the world except McMasters' creditors the land was the property of Mrs. McMasters. There is no evidence that she was a party to the proceedings by which Jones was to buy in the property, and therefore it is questionable whether a trust could be created in favor of McMasters out of the fund arising out of the property of a stranger. But Jones repudiated the trust immediately after the purchase of the property, and following that we have the significant transaction between McMasters and wife and Jones, a quitclaim deed, for a valuable consideration, of all the right, title and interest of McMasters and wife to Jones. At the time that that deed was given neither McMasters nor his wife had any right, title or interest in this property, unless it should be the interest in the fund arising from this agreement.

3. The giving of the quitclaim deed by McMasters and wife, coupled with the fact that no claim was ever made by any of the McMasters of the existence of such a trust during the lifetime of Jones, and the appeal to Jones on many occasions for funds not as a matter of right, but purely as a matter of charity, and the appeal to B. F. Jones, Jr., by McMasters, by letter of November 21, 1903, in which he states, "My family is now grown up and looking after themselves, but not in any position

to look after themselves and at the same time look after me," and he asks his cousin to set aside a certain amount that he may have from the income thereof sufficient to furnish him with a living, and states, "I make this appeal simply to your generosity," if there was in existence a trust from which he was entitled to receive nearly $3,000 a year and from which his children at his death would receive nearly $50,000, is it reasonable to suppose that he would have written such a letter to the man from whom he had the right to demand a sum which was to him a generous income?

Let the bill be dismissed at the cost of the plaintiff.

*Error assigned* was the decree of the court.

*H. M. Scott,* for appellant.

*W. B. Rodgers,* with him *George C. Wilson,* and *W. D. Evans,* for appellees.

PER CURIAM, January 4, 1909:

The decree is affirmed on the findings of fact and the conclusions of law by the learned judge of the common pleas.

---

# First National Bank of Homestead, Appellant, v. Lee.

*Promissory notes—Want of consideration—Affidavit of defense.*

In an action by a bank upon a promissory note made by the defendant to his own. order and indorsed by him, an affidavit of defense is sufficient which avers that the note was to be held by the plaintiff's cashier, who acted for it in the negotiations, until certain shares of stock held by it should be transferred to the defendant and certain notes and obligations indorsed by a third party should be delivered to him; that the promise to do these things was the only consideration for the note and that, in violation of the agreement, the note was delivered by the cashier and a transfer of the stock and delivery of the notes refused by the plaintiff.